# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| GERALD A. FAST, et. al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CASE NO. 06-4146-CV-C-NKL** |
| v. | ) | |
| | ) | |
| APPLEBEE'S INTERNATIONAL, INC | ) | |
| d/b/a APPLEBEE'S NEIGHBORHOOD | ) | |
| GRILL & BAR | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO
## DEFENDANT'S MOTION TO DECERTIFY THE CLASS

# TABLE OF CONTENTS

**Page**

I.  Introduction………………………………………….………………...  1

II.  FLSA Analysis ………………………………………………..........  2

A.  Applebee's Engaged in a Unified Policy or Scheme of FLSA Violations  3

1.  Applebee's "Policy" or Lack Thereof………………………….  4

2.  The Questionnaires……………………………………………  15

B.  Similar Factual and Employment Settings of Plaintiffs – A "Server Job is a Server Job."……………………………………………….....  18

C.  There is Not a "Disparate Factual or Employment Setting."…………...  22

1.  Applebee's "CORE Manual" and "Day Cards."……………………  23
2.  Applebee's Uses Its Servers and Bartenders Interchangeably………  26
3.  The "Associate Handbook."………………………………………  27

D.  Applebee's is Able to Defend this Case on a Collective Basis…………  28

1.  The Intent Underlying FLSA Collective Actions…………………...  28

2.  Applebee's Agreed to the Procedure for Representative Evidence…  32

E.  Fairness and Procedural Considerations Point to Denial of Decertification  33

III.  Conclusion …………..……………………………..................................  35

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946) ................................................... 29, 30

*Blake v. CMB Construction,* 1993 WL 840278 (D.N.H. March 30, 1993) ................................. 17

*Bradford v. Bed, Bath & Beyond*, 184 F.Supp.2d 1342 (N.D. Ga. 2002) .................................... 33

*Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973) ............................ 29

*Brock v. Norman's Country Market, Inc.*, 835 F.2d 823 (11th Cir. 1998) ................................... 31

*Donohue v. Francis Services, Inc.,* 2004 U.S. Dist. LEXIS 11525 (E.D. La., June 22, 2004) ..... 29

*Dove v. Coupe*, 759 F.2d 167 (D.C. Cir. 1985) ..................................................................... 17, 35

*Falcon v. Starbuck'sCorp.*, 580 F.Supp.2d 528 (S.D. Texas 2008)…………..... 24, 29, 30, 33, 34

*Frank v. Gold'N Plump Poultry, Inc.*, 2007 U.S. Dist. LEXIS 71179 (D. Minn., 2007) . 10, 11, 24

*Grayson v. K Mart Corp.*, 79 F.3d 1086 (11th Cir. 1996) ......................................................... 2, 4

*Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001) ......................................... 2, 4

*Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989) ........................................................ 3, 33

*Johnson v. Big Lots Stores, Inc.* 561 F.Supp.2d 567 (E.D. La. 2008) ......................................... 34

*Kautsch v. Premier Communications,* 2008 WL 294271 (W.D. Mo. 2008) ................. 2, 3, 29, 35

*Kelley v. Alamo*, 964 F.2d 747 (8th Cir. 1992) ............................................................................ 33

*Martin v. Selker Bros., Inc.*, 946 F.2d 1286 (3rd Cir. 1991) ........................................................ 30

*McLaughlin v. Dialamerica Marketing, Inc.,* 716 F.Supp. 812 (D.N.J. 1989) ............................ 30

*Mooney v. Aramco Servs., Inc.*, 54 F.3d 1207 (5th Cir. 1995) ...................................................... 3

*Moss v. Crawford & Co.*, 201 F.R.D. 398 (W.D. Penn. 2000) ................................................. 3, 19

*Mumbower v. Callicott*, 526 F.2d 1183 (8th Cir. 1975) ............................................................... 17

*Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir. 1991) ............................................................... 32

*Nerland v. Caribou Coffee Co.*, 2007 U.S. Dist. LEXIS 97166 (D. Minn. April 6, 2007) ........... 2

iii

Case 2:06-cv-04146-NKL   Document 198   Filed 02/17/09   Page 3 of 41

*Pendlebury v. Starbuck's Coffee Company*, 518 F.Supp.2d 1345 (S.D. Fl 2007)...... 19, 25, 31, 33

*Prickett v. DeKalb County*, 349 F.3d 1294 (11th Cir. 2003)...................................................... 3, 33

*Reich v. Cicle C. Investments Inc.*, 998 F.2d 324 (5th Cir. 1993) ................................................. 33

*Reich v. Gateway Press*, 13 F.3d 685 (3rd Cir. 1994) ........................................................... 29, 30

*Rodolico v. Unisys Corp.,* 199 F.R.D. 468 (E.D.N.Y. 2001)........................................................ 29

*Schultz v. Captial Intern. Sec., Inc.*, 466 F.3d 298 (4th Cir. 2006)................................................ 29

*Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) ............................... 2, 3

*Wilks v. Pep Boys*, 2006 U.S. Dist. LEXIS 65939 (M.D. Tenn. 2006) ....................... 1, 29, 30, 34

**Statutes**

29 U.S.C. § 216(a)(1)..................................................................................................................... 2

29 U.S.C. § 216(b) ............................................................................................................... 2, 3, 28

iv

# I.    **Introduction**

This is a case in which 5,549 servers and/or bartenders who worked for the defendant ("Applebee's") have joined together seeking compensation for what they allege to be improper payment of wages. Specifically, they allege they should have been paid at least minimum wage for certain time they spent performing general preparation and/or maintenance work, such as cleaning, food preparation, etc., rather than the approximately $2.00 to $3.00 per hour they were actually paid for this work. Each of the individual opt in plaintiffs has a relatively small claim, but together their claims are substantial.

If the Court grants Applebee's Motion for Decertification, it will essentially mean that most, if not all, of the opt in plaintiffs will be left with no practical remedy, as their claims will be too small to be economically feasible to bring individually. Applebee's complains that they need to defend each plaintiff's case "individually" in an attempt to persuade the Court it should not allow these servers and bartenders to proceed collectively. However, the collective action procedures of the Fair Labor Standards Act reflect "Congress's determination that defendants will not always have the opportunity to pursue individual defenses against FLSA plaintiffs." *Wilks v. Pep Boys*, 2006 U.S. Dist. LEXIS 65939 *8 (M.D. Tenn. 2006). Not once in Applebee's Suggestions in Support of their Motion to Decertify did it mention the purpose of the FLSA collective action procedures. However, the Motion and Applebee's arguments must be viewed in light of the purpose of this important procedure, which is clearly to allow those whose damages may be relatively small individually the chance to join together to fight the large corporate employer whose resources far out-weigh their own.

## II.    <u>FLSA Analysis</u>

Employees may bring suit under the FLSA on their own behalf and on behalf of all those who are "similarly situated."  29 U.S.C. § 216(a)(1).  29 U.S.C. § 216(b) spells out the requirements for the adjudication of claims as collective actions, but does not define "similarly situated."  See, *Thiessen v. General Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001). Federal courts have applied varying standards in making the similarly situated analysis. Significantly, the Eighth Circuit has not dictated what standard should be used by district courts to determine whether opt in plaintiffs are similarly situated.  *Nerland v. Caribou Coffee Co.*, 2007 U.S. Dist. LEXIS 97166 (D. Minn. April 6, 2007).

At this stage of the proceedings, the plaintiffs bear the burden to show that they are similarly situated.  *Kautsch v. Premier Communications,* 2008 WL 294271 at * 1 (W.D. Mo. 2008).  This burden is not a heavy one.  See, *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996).   Plaintiffs can demonstrate this by showing ***either***:  (1) their employer engaged in a unified policy, plan, or scheme of FLSA violations ***or*** (2) if the plaintiffs can otherwise show that their positions are "similar, not identical, to the positions, held by other class members." *Kautsch* 2008 WL 294271 at *1*, citing Grayson.*, 79 F.3d at 1096 and *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001).  Although plaintiffs are only required to show one of the above factors, they can and will show both in this opposition.

District courts then typically weigh three primary factors in determining whether a collective action under § 216(b) is appropriate for determination of all opt in employees' claims: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3)

2

fairness and procedural considerations." *Thiessen*, 267 F.3d at 1103. However, even where factors (1) and (2) may weigh in favor of decertification of a previously certified class, "the district court must balance those factors with the fundamental purpose of 29 U.S.C. § 216 (b): (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves 'common issues of law and fact that arose from the alleged activity.'" *Kautsch* 2008 WL 294271 at *2, *citing Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000).

The decision to certify or decertify a collective action under § 216(b) is within the district court's discretion. *Mooney v. Aramco Servs., Inc.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995). "A collective action allows...plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged...activity." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). *See also*, *Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003) ("Congress' purpose in authorizing § 216 (b) class actions was to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer.").

### A.    Applebee's Engaged in a Unified Policy or Scheme of FLSA Violations.

Applebee's has engaged and continues to engage in various schemes to take advantage of its tipped employees who are paid significantly less than full minimum wage. These unlawful schemes have resulted in gigantic savings in labor costs, and therefore significantly larger profits for Applebee's. Plaintiffs are able to avoid decertification of this collective action because Applebee's has indeed engaged (and more egregiously, continues to engage) in a unified policy, plan or scheme of FLSA violations as it relates to the improper compensation of plaintiffs.

3

*Kautsch* 2008 WL 294271 at *1*, *citing Grayson.*, 79 F.3d at 1096 and *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001).

### 1.     <u>Applebee's "Policy" or Lack Thereof.</u>

Applebee's claims it has a policy that its tipped employees should not be spending more than twenty percent of their shift conducting non-tip producing duties.[1] Applebee's has even represented to the Department of Labor that it has such a policy.[2] If such a policy exists, that policy would be in line with the mandates of the FLSA. However, after significant discovery it is clear that Applebee's does not actually have such a policy. In fact, Applebee's plan, policy and scheme is the opposite: to take advantage of plaintiffs, its servers and bartenders, who conduct general preparation and maintenance work for more than 20% of their shifts while being paid at a rate significantly less than full minimum wage.

The purported "no more than 20%" policy is not written down anywhere in Applebee's corporate documents or training materials.[3] Further, there is no written policy in place at Applebee's regarding duties conducted that are non-incidental to the tipped employee's job

---

[1] See, Weston deposition, 51:6-10, 66:17-25, Exhibit 1. Ms. Weston was produced by Applebee's as a corporate representative to testify regarding Applebee's policies and procedures relating to supervising, monitoring and auditing tipped employees to ensure compliance with the FLSA (37:7-24). She has been employed by Applebee's in the following employment positions: as a Management Recruiter (13:14-17), Human Resources Generalist (14:16-22), Human Resource Manager (17:20-22), Senior Human Resource Manager (19:1-4) and Human Resource Leader (20:1-4).

[2] See, September 15, 2005 letter from Applebee's written by Jennifer Schellhase to Carla Bunch with the Department of Labor, Exhibit 2.

[3] See, Weston deposition, 66:17-67:3, Exhibit 1; Sackett deposition, 24:2-11, Exhibit 3 (Mr. Sackett was employed by Applebee's as a Human Resource Manager (8:16-20).); McCorry deposition, 81:18-25, Exhibit 4 (Mr. McCorry is employed by Applebee's as a Human Resource Manager and was also an Area Director. (12:6-8, 45:13-16)); Delamater deposition, 44:8-46:8, 47:18-23, Exhibit 5 (Mr. Delamater held the positions of General Manager, Area Director and Director of Operations with Applebee's (10:10-16, 11:16-17, 12:12-13)).

4

description.[4]  The purported "no more than 20%" policy is not communicated to Applebee's managers, trainers or its employees, including plaintiffs.[5]  If such a policy truly existed at Applebee's, why is it not communicated to those charged with its enforcement or to those whom it affects?

Applebee's claims that it adheres to the guidelines of the Department of Labor, including the mandate that if tipped employees spend a substantial amount of time, in excess of 20%, performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties.[6]  However, Applebee's also asserts that it does not understand the term "general preparation work or maintenance" as that term is used by the law and it has done nothing to clarify what the regulations mean.[7]

Clearly, each plaintiff has been assigned daily cleaning and stocking duties (known as sidework).[8]  However, no policy is in place directing the amount of time a tipped employee is to spend during his/her shift performing sidework, and no studies have been conducted by Applebee's concerning how long its servers and bartenders perform these general preparation and/or maintenance duties each shift.[9]  No studies have been conducted by Applebee's to determine how long it takes a typical server or bartender to conduct the specific duties assigned

---

[4] See, Sackett deposition, 23:22- 24:1, Exhibit 3.

[5] See, Sackett deposition, 35:8-16, Exhibit 3; Weston deposition, 110:11-111:15, 143:4-9, Exhibit 1.

[6] See, Weston deposition, 42:1-5, 45:25-47:17, Exhibit 1.

[7] See, Weston deposition, 42:24-45:24, Exhibit 1.

[8] See, CORE manual, Exhibit 6; Sackett deposition, 34:15-19, Exhibit 3; Vandewater deposition, 70:14-24, Exhibit 7 (Mr. Vandewater is employed by Applebee's as the Executive Director of Training. (23:10-13)); Delamater deposition, 32:18-36:19, 43:16-23, 52:21-54:6, Exhibit 5; Weston deposition, 118:10-133:1, Exhibit 1.

[9] See, McCorry deposition, 27:18-31:8, Exhibit 4; Sackett deposition, 30:9-19, Exhibit 3; Vandewater deposition, 70:25-71:5, Exhibit 7; Delamater deposition, 33:17-20, 34:9-24, 36:14-19, 52:21-54:6, 83:9-14, Exhibit 5.

to them in their job description and in the Applebee's manuals and training materials.[10] Similarly, Applebee's is aware that its tipped employees are washing dishes while being paid at the lower tipped employee rate; however, there is no guideline or policy in place regarding how long is too long for those employees to be washing the dishes, and no studies have been conducted on how long Applebee's servers and bartenders are washing dishes during their shifts.[11] Further, it seems that many of Applebee's employees in higher management positions (human resource managers, area directors, director of operations) know of the 20% rule through education or training outside of Applebee's, however, those management employees do nothing to implement, study or even discuss the 20% rule at Applebee's.[12]

Additionally, there is often the situation in Applebee's restaurants when no general utility person is scheduled to work.[13] The general utility position is responsible for such things as dishes, general prep and cleaning.[14] Often the responsibilities of the general utility position fall on the tipped employees when no general utility employee is scheduled.[15] Although Applebee's is quite aware that often there is no employee in the store responsible for washing dishes and cleaning, there are no policies in place at Applebee's as to whom should pick up those

---

[10] See, Vandewater deposition, 70:25-71:5, 80:22-81:10, 82:7-18, 105:14-24, 108:20-109:3, Exhibit 7; Weston deposition 111:16-114:15, 136:22-137:1, Exhibit 1.

[11] See, McCorry deposition, 69:10-70:24, 91:10-21, Exhibit 4; Sackett deposition, 48:9-14, 49:1-6, Exhibit 3; Delamater deposition 31:14-33:16, Exhibit 5.

[12] See, McCorry deposition, 42:2-44:8, Exhibit 4; Sackett deposition 24:14-25, Exhibit 3; Yeganeh deposition, 78:15-25, Exhibit 8 (Mr. Yaganeh is employed by Applebee's as an Area Director. (21:7-8)); Schellhase deposition 79:3-12, Exhibit 9 (Ms. Schellhase was employed by Applebee's as a Human Resource Manager. (19:15-17)).

[13] See, Delamater deposition, 59:18-23, 60:24-61:3, Exhibit 5; McCorry deposition, 86:15-18, 87:12-15, Exhibit 4; Sackett deposition, 49:16-24, Exhibit 3.

[14] See, Delamater deposition, 61:7-14, Exhibit 5; Sackett deposition, 49:10-15, Exhibit 3.

[15] See Resolve It complaints at Exhibit 10; Sackett deposition, 48:5-14, Exhibit 3.

responsibilities at that time.[16]  Applebee's trains, reviews and enforces many minute policies such as the timing of delivering a drink and delivering a guest check, but fails to address who picks up the responsibilities of an entire employment position when that position is not filled. Does Applebee's honestly believe that this Court or anyone would buy that in the absence of a general utility employee it innocently assumes the dishes are washed and the trash is taken out by employees making full minimum wage, especially when that decision is left up to the manager whose compensation structure is such that he/she will make more in the way of a bonus if those tasks are completed by tipped employees?  Applebee's knows its tipped employees are picking up the slack in those stores where no general utility is scheduled and it fails to create, review or enforce a policy to limit the use of tipped employees doing that non-incidental work.[17]

Applebee's store managers are paid bonuses based on the profitability of their store.[18] The largest component of the "costs" of any store is labor hours.[19] Bartenders and servers are the lowest paid employees at an Applebee's location.[20]  Therefore, it would be in any store manager's financial self interest to use servers and bartenders for as much general preparation and maintenance work as possible since they cost very little and would help the store managers earn more money.

Applebee's readily admits that it scrutinizes and times many aspects of its business and of its tipped employees' jobs, except the time spent conducting general preparation and

---

[16] See, Delamater deposition, 59:24-61:25, Exhibit 5; McCorry deposition, 88:2-9, 90:4-21, Exhibit 4; Sackett deposition, 50:4-51:11, Exhibit 3.

[17] See the Resolve It complaints at Exhibit 10.

[18] See, Yeganeh deposition, 101:23-25, Exhibit 8; Delamater deposition, 29:3-30:17, Exhibit 5.

[19] See, Yeganeh deposition, 103:14-17, Exhibit 8.

[20] See, Yeganeh deposition, 103:18-104:6, Exhibit 8.

7

maintenance work.  For example, it has policies, which are reviewed, studied and enforced, regarding how long it takes a server to greet a guest after that guest is seated, how long it takes servers to get food to the guest, how long it takes servers to deliver the guest check, how long it takes a server to check back to the guest table after delivering food and how long it takes a server to deliver guest drinks.[21]  Applebee's has a policy, which it reviews, studies and enforces regarding the time ("timed to the second") it takes to prepare each and every menu item.[22]  Those timed activities are standards which are trained, reviewed and enforced with training materials, quizzes, server reviews and semi-annual store audits.[23]  Why would Applebee's train and enforce the time it takes a server to deliver a guest check, when the length of that activity has no impact on whether it is violating the FLSA, when it has not conducted any studies on how long it takes a server to take out the trash, which does impact whether it is violating the FLSA?  The answer has everything to do with profits.

Applebee's is the largest casual dining concept in America.[24]  It reported net earning profits of $101.8 million in fiscal year 2005, $80.9 million in fiscal year 2006.[25]  It cannot seriously argue that it has achieved these successes without strictly analyzing its labor costs.  It cannot seriously expect this Court or anyone to believe that it just does not know how long its servers and bartenders spend conducting sidework each shift. (Especially when it admits that it "stipulates operating standards and specifications, including service procedures" and when it

---

[21] See, McCorry deposition, 74:13-22, 74:32-75:12, Exhibit 4; Sackett deposition, 30:21-25, 31:1-10, Exhibit 3; Delamater deposition 82:12-23, Exhibit 5.

[22] See, Sackett deposition, 31:11-18, Exhibit 3; McCorry deposition, 75:24-76:16, Exhibit 4.

[23] See, McCorry deposition, 75:19-23, Exhibit 4; Delamater deposition, 82:24-8, Exhibit 5.

[24] See, 2006 Applebee's 10-K, pg. 4  Exhibit 11.

[25] See, 2006 Applebee's 10-K, pg. F-11, Exhibit 11.

studies, writes and enforces policies concerning what seem to be much more trivial aspects of its business as listed above.[26]) It knows. It knows that those individuals spend much longer than 20% of their shifts and it knows that has a huge impact on its labor costs and profits. It also knows if it writes that information down, if it conducts formal studies, it will have a harder time defending its FLSA violations. That's why those studies are not recorded and that information has not been uncovered. Applebee's scheme of turning its head the other way on this issue will not fool this Court.

Even its own expert, Robert Crandall, recognizes that records are the "gold standard" when trying to verify what was done by Applebee's servers and bartenders and that it failed to provide him with any such records.[27] Applebee's is now trying to benefit from sticking its head in the sand. As will be discussed in more detail below, neither fairness nor the law will allow Applebee's to benefit from its lack of records on this issue.

Applebee's apathy toward the FLSA rules and it's supposed "policy" relating to the twenty percent rule is illustrated by the following testimony of its corporate representative on the issue of compliance with the FLSA and DOL regulations:

> Q.     The 20 percent rule as we referred to it earlier in the deposition, you don't train your managers at all on the 20 percent rule, correct?

> A.     We do not.

Weston deposition, 107:11 – 15 attached as Exhibit 1.

> Q.     Who is in charge of seeing that the policy that nontipped duties should not exceed 20 percent of the shift is not violated?

> A.     It – that would be, you know, in the hands of our – of our field operations team and our human resources managers . . .

---

[26] See, 2006 Applebee's 10-K, pg 6, Exhibit 11.

[27] See, Crandall deposition, 183:15-184:20, Exhibit 12. Mr. Crandall is Applebee's retained expert in this case.

9

Q.      Are the human resources managers told about the 20 percent policy?

A.      No.  We don't teach them about a 20 percent policy. . . .

Q.      Are the field operations – anybody in the field operations team told about the 20 percent policy?

A.      Again, we don't directly educate them on that. . . .

*Id.* at 110:11 – 111:9.

Applebee's policy to essentially not have a policy (no writing, training, communication, studies, enforcement), creates a policy in itself.  It is essentially a policy to ignore the 20% rule, and therefore, a policy, plan and scheme to violate the FLSA.  See, *Frank v. Gold'N Plump Poultry, Inc.*, 2007 U.S. Dist. LEXIS 71179 *8 (D. Minn., 2007) ("…even if Gold'N Plump is correct, it *does* have a policy – a policy not to have a policy.") (emphasis original).

*Frank v. Gold'N Plump Poultry, Inc.* is extremely instructive in this matter.  There, the plaintiffs joined together in a collective action against defendant claiming FLSA violations related to not being properly paid for time donning and doffing clothing. *Id.* at *3.  As in this case, the Department of Labor had previously reprimanded defendant and provided direction about the proper way to compensate the employees at issue in the circumstances.  *Id.* at *9.  As in this case, the defendant took the necessary steps to appease the Department of Labor, but did not change its practices. *Id.* at *9.  In *Frank*, the defendant claimed it did not have a policy to avoid pay for donning and doffing time, but rather it left that decision up to the individual supervisors – which it claimed caused such difference among the class members as to necessitate decertification. *Id.*  The Court was not fooled by defendant's scheme. *Id.*  The Court found it hard to believe, given the competitiveness of the industry and the fact that not a single supervisor was found who had kept records of donning and doffing time, that such a decision was left to the supervisors and that no such plan of avoiding proper payment existed. *Id.* The Court found that

10

Gold'N Plump's failure to write down a specific policy to pay for donning and doffing time, was in fact a policy in itself *not* to pay for such time. *Id.* The Court stated, "The bottom line is that Gold'N Plump has, at a minimum, decided not to require that its employees be paid for donning and doffing. That no-policy policy has allegedly injured all members of the putative class and is properly challenged through a class action." *Id.*

The bottom line in this case is that Applebee's has decided not to pay plaintiffs, its servers and bartenders, properly for their time when they spend over 20% of their shift conducting general preparation and maintenance work. Even after the Department of Labor warned Applebee's of its unlawful practices (and was appeased by Applebee's promise to change, which never occurred[28]), even after Applebee's received several notices from its employees regarding its unlawful practices and even after this litigation was filed 2 years ago warning Applebee's of its unlawful practices, it still has not issued and enforced a written policy to address this issue.[29] True, it is not written anywhere in Applebee's documents not to pay full minimum wage for this time, however, just as in *Frank*, the Court will not be fooled and this no-policy policy has injured the plaintiffs and is properly challenged through a class action.

Applebee's no-policy policy is enough to deny decertification in this matter. However, to add further support for that denial, there are plenty of examples of affirmative schemes and affirmative acts of ignoring warnings by Applebee's showing a knowing willingness (plan, scheme and policy) to violate the FLSA as claimed by plaintiffs. Applebee's affirmatively states

---

[28] See, Schellhase letter to Department of Labor dated September 15, 2005, Exhibit 2 (stating that Applebee's will be "taking a look at the associate handbook and orientation materials to ensure that our associates are completely educated on wage and hour systems, processes, and policies.") See also, Schellhase letter to Department of Labor, dated October 25, 2005 (stating "we are putting in measures to ensure this doesn't happen in the future and will continue to monitor the satiation."), attached hereto and incorporated herein by reference as Exhibit 13.

[29] See, Schellhase deposition, 110:22- 24, 115:7-25, Exhibit 9.

in its "Labor Management Best Demonstrated Practices" for its managers to use bartenders and servers for general preparation and maintenance work. Interestingly, there is no caution in the document regarding the proper pay for the employees while they conduct such duties or the amount of time they may spend on such activities. The document states:

- BOH savings are possible by utilizing FOH Associates to complete some or all of the following:

    - Servers portion prep items during slow times.
    - All FOH Associates can act as the GU for slow shifts.
    - All FOH Associates can act as the Expo during slow times.

See, AP 001817.[30]

Applebee's own internal documents show the practice of using servers and bartenders for general preparation and maintenance work occurs across the country. For example, Applebee's has a "Resolve It" line where employees can call and file complaints regarding their working environment. One such Resolve It complaint from Gaines Township, Michigan dated April 21, 2006, shows that the caller made the following complaint:

> "Caller,…, reported that since the store opened in July, 2005, General Manager Brian (last name UNKNOWN) and Manager Rachel (last name UNKNOWN) have been having the server staff perform functions outside waiting table, and they have not been paid minimum wage. The caller said the servers are asked to label the stock in the cooler, clean the beer shed, prepare food and other things. He/she believes they should clock out as a server and clock in as a non-server so they will be paid full minimum wage."

See, Exhibit 10, AP 002190. Similar Resolve It complaints were received by Applebee's from Southgate, Michigan (AP 002198) (employee complaint regarding server having to wash dishes);

---

[30] Applebee's Best Demonstrated Labor Practices is attached hererto as Exhibit 14 and incorporated herein by reference. "BOH" stands for back of the house and "FOH" stands for front of the house. Front of the house employees include servers and bartenders, back of the house employees include cooks, general utility and expo employees. (See, McCorry deposition, 77:7-24, Exhibit 4).

Farmington Hills, Michigan (AP 002194) (employee complaint regarding server having to wash dishes); Norfolk, Virginia (AP 002200) (employee complaint regarding servers having to wash dishes and take out garbage; management told employee that they make enough in tips to justify the extra duties); Boston, Massachusetts (AP 002184) (employee complaint regarding servers working outside their job description handling all "to go" orders); Kansas City, Kansas (AP 002186) (employee complaint regarding servers having to wash dishes); Horn Lake, Mississippi (AP 002192) (employee complaint regarding bartender being forced to work as dishwasher and as a Car-Side To Go; employee demanded that he either be allowed to solely work as a bartender or to be paid the proper wage for performing the other jobs); Cedar Hill, Texas (AP 002196) (employee complaint regarding server having to wash dishes); and Houston, Texas (AP 002197) (employee complaint regarding server having to wash dishes).[31]  These documents also show that if Applebee's truly just did not know that its servers and bartenders spent over 20% of their shifts in general preparation and maintenance work before, unlikely from a company that monitors guest check delivery time and drink turn around time, it was repeatedly notified and warned by its own employees through these complaints.  Applebee's Senior Human Resources Manager reviews a summary of the Resolve It complaints from across the country once a month.[32]  Applebee's is and was very aware of the above employee complaints, but chose not to follow up on such warnings by changing its conduct.  Indeed, in response to the complaint referenced in document AP002190 which complained that servers were performing "functions outside of

---

[31] Copies of these Resolve It complaints are attached hereto as Exhibits 10 and are incorporated herein by reference. It should also be noted that there is a limited number of these complaints which were produced due to Applebee's "document retention" policies.

[32] See Weston deposition, 33:15-21, 34:21-22, Exhibit 1.

13

waiting tables," Applebee's investigated and found "nothing outside the norm." See, AP00205 attached as Exhibit 10.

Applebee's also chose not to follow up or change its ways after it was reprimanded, fined and required to pay back wages to its employees by the Department of Labor for using tipped employees to perform general preparation and maintenance work in excess of 20% of their shift without full minimum wage pay. The DOL performed an investigation which revealed that servers and bartenders were spending approximately 45% of their shift in non-tipped or general maintenance or preparation work.[33] Applebee's assured the DOL that changes would be made to remedy the problem, but have done nothing beyond possibly a meeting of a small group of individuals who cannot seem to remember what was said or what direction came from the meeting.[34] Even the corporate representative produced to discuss Applebee's policies as it relates to the issues of this case could not provide an answer as to what was done to remedy the problem brought forward by the Department of Labor, which mirrors the complaints of plaintiffs in this case.[35]

Additional support showing that Applebee's is very much aware of its violations of the FLSA as argued by plaintiffs comes from the fact that many tipped employees of Applebee's have pointed out the unfairness of the situation, even before the filing of this case. In addition to the above referenced Resolve It complaints, one of the opt in plaintiffs (whose identity is subject

---

[33] See, August 4, 2005 letter from Applebee's to the DOL, attached hereto and incorporated herein by reference as Exhibit 15.

[34] See, Schellhase deposition, 174:12-25, Exhibit 9; Bradley deposition, 24:8-21, 103:7-16, Exhibit 16 (Ms. Bradley is employed by Applebee's as a Human Resource Manager and was produced as a corporate representative on the oversight of the ongoing operations of Applebee's restaurants and the Department of Labor investigation. (4:19-5:10; 34:4-35:3)); Weston deposition, 65:6-24, Exhibit 1; McCorry deposition, 56:5-22, Exhibit 4.

[35] See, Weston deposition, 65:6-24, Exhibit 1.

to a confidentiality agreement but whose deposition transcript is filed under seal with this opposition) testified that she complained to management in her restaurant about excessive sidework at the tipped rate and was told that "it was Applebee's policy."[36]

## 2. The Questionnaires.

Representative results from two questionnaires, one prepared by Applebee's and one by plaintiffs' expert, also demonstrate that Applebee's policy of using tipped employees for excessive amounts of general preparation and maintenance work is widespread. Applebee's filed Suggestions in Opposition to Plaintiffs' Motion for Conditional Class Certification with this Court on March 16, 2007 where it attached declarations of a number of its employees. These declarations contained a questionnaire each employee completed regarding the amount of general preparation and maintenance work they performed. The questionnaires filed by Applebee's show that the average tipped employee of Applebee's spent in excess of 20% of their shift performing general preparation and maintenance work. The questionnaires filed by Applebee's were from employees who worked at Applebee's locations in Columbia, Missouri, Jefferson City, Missouri, St. Charles, Missouri, Tuscaloosa, Alabama, St. Joseph, Missouri, Poplar Bluff, Missouri, St. Peter's, Missouri and St. Paul, Minnesota.

In addition, plaintiffs' expert prepared a questionnaire that was completed by the opt in plaintiffs. The questionnaire was created by plaintiffs' expert who is a former investigator with Department of Labor Wage and Hour Division. The questionnaire was based on his experience in gathering information from employees in FLSA cases and was also patterned after Applebee's own questionnaire that it provided to this Court in support of its Suggestions in Opposition to

---

[36] See, P.G. deposition, 69:4-18, Exhibit 17.

Plaintiffs' Motion for Conditional Class Certification.[37]  The average amount of time spent by opt in plaintiffs performing general preparation and maintenance work who responded to the questionnaire was approximately 47%.  Interestingly, this average is very close to the average found by the Department of Labor during their recent investigation, which was around 45%.[38]  Rather than address the substantive factual issue, Applebee's mocks the results of the questionnaire and ignores the scientific nature of the responses.  Dr. Hagar, a statistical expert employed with the University of Missouri, analyzed the data and found that the vast majority were within a statistically expected range.[39]  In fact, Applebee's points out a few extreme questionnaire results, but ignores the vast majority of the responses and fails to note that over 95% of the responses fall within 2 standard deviations from the average, obviously indicating the vast majority are centered around the average.[40]

Applebee's spends more than half of their Suggestion of Support being critical of the plaintiffs' efforts to do what was Applebee's job; keeping track of the proper hours worked by the plaintiffs.  It, as the employer, has the responsibility to know how much time their employees spent on general preparation and maintenance work.  In simply did not do this.  Then, when the plaintiffs attempt to assist the Court and the jury in doing Applebee's job, all it can do is claim that the plaintiffs did it wrong.  This is exactly why the law puts this responsibility on the employer and plainly states that the employer's failure to keep these records cannot be used as a

[37] Surprisingly, Applebee's attacks various aspects of the plaintiffs' questionnaire as being technically and scientifically unsound.  However, when Applebee's used this same format to support its position with this Court it had no problem with the format of the questionnaire.

[38] See Exhibit 15.

[39] A copy of Dr. Hagar's report (without attachments) is attached hereto as Exhibit 18.

[40] Id. at 2b(5), Figure C.

sword to attack the plaintiffs in a FLSA case. *Mumbower v. Callicott*, 526 F.2d 1183, 1186 (8th Cir. 1975).

It is beyond question that Applebee's does not keep track of the time that its tipped employees spend on general preparation and maintenance work.[41] As this Court has previously held and as the DOL told Applebee's, there is a 20% limit on the amount of time these employees can spend on these tasks per shift. This case seeks to recover the amount of time the plaintiffs have spent on those duties. That task is made more difficult since Applebee's does not keep track of this time.

When an employer has failed to keep adequate records of the time employees spent while being improperly compensated under the FLSA, the employees merely bear the minimal burden of proving the time worked as a matter of "just and reasonable inference." *Dove v. Coupe*, 759 F.2d 167, 173-75 (D.C. Cir. 1985). After the employees have shown that unpaid work occurred, the employee is only required to provide a reasonable approximation of the hours worked. *Id.* After there is a reasonable estimate, the burden then shifts to the employer to show the actual amount of time worked. *Id.* The burden on the employer of disproving the employee's approximation is "a significant one." *Blake v. CMB Construction,* 1993 WL 840278 at *5 (D.N.H. March 30, 1993).

In short, Applebee's operates under a unified plan, policy and scheme of FLSA violations, even though such policy remains unwritten. This is demonstrated by Applebee's failure to impose and enforce a policy of properly paying for plaintiffs' time, its failure to follow up on multiple warnings of its unlawful behavior and its failure communicate, study and train proper compensation practices to those charged with enforcement and to those employees

---

[41] See Weston deposition, 112:14-114:10, Exhibit 1.

17

affected. This alone is sufficient for the denial of decertification. Additional support, also providing independent evidence for the denial of decertification, follows.

### B. Similar Factual and Employment Settings of Plaintiffs – A "Server Job is a Server Job."

In addition to showing a unified policy or scheme of FLSA violations, plaintiffs can also show the similar nature of the plaintiffs' functions and employment settings.

"A server job is a server job" and a bartender job is a bartender job.[42] A well put statement of Applebee's expert signifies the common sense logic of this case – that the plaintiffs, all current or former servers and bartenders at Applebee's, are similar in their factual and employment settings. The plaintiffs are required to follow the same rules, follow the same Code of Conduct, they are trained by the same materials, they are reviewed by the same standards, they take the same quizzes, they share common job descriptions, they are subject to the same management structure, they are subject to the same discipline policy, they have access to the same complaint process, they have access to the same benefits (vacation, health insurance, life insurance, dental plan, etc.), they follow the same guidelines, they are subject to the same handbook, they perform the same duties, they are expected to follow uniform standards of Applebee's and the list of similarities could go on and on.[43]

The plaintiffs in this case are similarly situated. All plaintiffs assert a common claim; that Applebee's violated the FLSA by paying them significantly less than the full minimum wage

---

[42] See, Crandall deposition, 75:12-14, Exhibit 12.

[43] See CORE manual, Exhibit 6; Associate Handbook, Exhibit 19; server training day cards, Exhibit 20; bartender training day cards, Exhibit 21; 2006 Applebee's 10K, pg 6, Exhibit 11; McCorry deposition, 47:25-48:9, 48:21-49:9, 84:3-10, 123:1-25, 124:4-6, 128:5-129:3, Exhibit 4; Vandewater deposition, 21:11-22:1, Exhibit 7; Sackett deposition 13:2-9, 37:13-25, 38:10-12, 61:25-62:12, Exhibit 3; Delemater deposition, 18:13-22:13, 48:13-19, 64:24-72:14, Exhibit 4; Weston deposition, 22:1-24, 64:10-20, Exhibit 1.

while requiring them to engage in more than 20% of their shift doing general preparation and maintenance work. *See*, *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Penn. 2000) (denying decertification where each of the plaintiffs asserted a common claim). The most notable evidence of similarity of the plaintiffs is the fact that the defendant itself has asserted to the federal government that the plaintiffs are similar by making the collective decision with regard to all of the opt in plaintiffs that it was/is entitled to take a tip credit for the hours worked by the opt in plaintiffs. It is rather hypocritical of the defendant to now argue there is no way for this court to make a collective decision that the tip credit was not properly taken as to the entire class of plaintiffs, when it decided on a collective basis that the tip credit was proper for all of the plaintiffs. See, *Pendlebury v. Starbuck's Coffee Company*, 518 F.Supp.2d 1345, 1352 (S.D. Fl 2007)("The Court finds it disingenuous for [Defendant], on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming that the plaintiffs cannot proceed collectively to challenge the exemption.").

In reading Applebee's Suggestions in Support of its Motion to Decertify one would think all of its restaurants are run individually with no continuity among them. The evidence shows that nothing could be further from the truth. Even Applebee's expert agrees that the servers and bartenders at the stores he observed perform in essence the same types of duties.[44]

Applebee's Form 10-k filed with the Securities and Exchange Commission on March 10, 2006, shows the uniform nature of Applebee's business model – utilized across its system, in

---

[44] See, Crandall deposition, 74:24-75:3, Exhibit 12.

each restaurant within the system.[45]  Down to the restaurant décor, each Applebee's is similar.

Each restaurant displays photographs, magazine, and newspaper articles highlighting local

history and personalities.[46]  These items are "an important aspect of the Applebee's brand."[47]

Applebee's also requires "that each restaurant be remodeled every six to seven years to embody

the design elements of the current prototype."[48]  Applebee's operates restaurants in accordance

with operating standards and specifications and they are applied "on a system-wide basis."[49]

When opening a new restaurant within the Applebee's system, Applebee's corporate provides

guides for opening managers explaining how to conduct these standards in order to maintain the

Applebee's brand though similarity.[50]  Applebee's has also created and utilizes a standard audit

worksheet/checklist for the semi-annual audit of each corporate restaurant to ensure the

restaurants comply with Applebee's standards and maintain the similarity necessary to uphold

the brand.[51]  This audit is detailed; it covers food preparation, guest experience, restaurant

environment, scheduling and other aspects of the Applebee's brand.[52]  Missing from this audit is

any check on time spent by tipped employees on non-tipped duties or on incidental duties.

---

[45] Relevant portions of the 2006 Applebee's 10-K are attached hereto and incorporated herein by reference as Exhibit 11.  See, pg. 4-5 of 57, Exhibit 11.  Applebee's has since been purchased by Internal House of Pancakes.

[46] See, Id., pg. 4 of 57.

[47] See, Id.

[48] See, Id.

[49] See, Id., pg. 4-5 of 57.

[50] See, Vandewater deposition 35:21-36:8, Exhibit 7.

[51] See, McCorry 17:3-23, 27:18-31:8, Exhibit 4; Vandewater deposition 106:21-108:11, Exhibit 7; Sackett 21:17-22:8, Exhibit 3.

[52] See, McCorry 17:3-23, 27:18-31:8, Exhibit 4.

20

The staff at a typical Applebee's restaurant consists of one general manager, one kitchen manager, two or three managers and approximately sixty hourly associates.[53]  Applebee's associates "are provided with a structured orientation and five day training program upon hire. This training is provided by restaurant trainers who have completed extensive certification process to become a trainer.  In addition, associates receive ongoing training to further develop their job skills and knowledge."[54]

Applebee's has implemented a highly centralized method of information technology. Applebee's states "our in-store systems including point-of-sale and food, kitchen and labor management systems are tightly integrated with our above-store data warehousing and support platforms.  This integration provides management with a timely, accurate, and comprehensive view of our business performance."[55]  Finally, Applebee's seeks to maintain high food quality and "system-wide consistency" in its food supply program.[56]  Those system-wide processes and decisions would not be possible if each restaurant was, as Applebee's argues, vastly different.

Although the opt ins worked at different locations, they held the same job titles (servers or bartenders) and worked under the exact same job descriptions.[57]  Wayne Vandewater, the Executive Director of Training for Applebee's, testified that the basic duties performed by servers and bartenders were similar regardless of the location of the server or bartender.[58]

---

[53] See, 2006 Applebee's 10-K, at pg. 6 of 57; Exhibit 11.

[54] See, Id. at pg. 5 of 57.

[55] See, Id. at pg. 5 of 57.

[56] See, Id.

[57] See, Weston deposition, 44:12-24, 51:24-52:3, Exhibit 1.

[58] See, Vandewater deposition, 26:17-27:4, Exhibit 7.

Case 2:06-cv-04146-NKL   Document 198   Filed 02/17/09   Page 25 of 41

The testimony of Applebee's supervisors further demonstrates that its servers and bartenders were to follow the duties listed on the "day cards" and the job descriptions and standards as found in the Core Manual.[59]  The Core Manual is found in every corporate Applebee's store throughout the country and is a reference tool for employees on how to perform job functions.[60]  It teaches Applebee's standard operating procedures to all associates.[61]  These standards are "uniform" standards that apply to all servers and bartenders.[62]  The day cards contain job descriptions for all bartenders and servers and are used in training all bartenders and servers.[63]  The day cards are the same at every corporate restaurant.[64]  These documents were made available to all servers and bartenders at every location where they worked.[65]  In addition, all opt ins were subject to the same pay provisions in that Applebee's took a tip credit for all of the hours worked by the opt in plaintiffs.[66]

## C.    There is Not a "Disparate Factual or Employment Setting".

Applebee's next argues that the opt in plaintiffs have "disparate employment settings" that should prevent them from joining together.  As set forth above, Applebee's clearly strives for a uniform customer experience which would suggest similar employment settings for its

---

[59] See, Vandewater deposition, 63:1-64:25, Exhibit 7.

[60] See, Vandewater deposition, 46:1-24, Exhibit 7.

[61] See, Vandewater 43:12-14, Exhibit 7.

[62] See, Weston deposition 44:12-24, 51:24-52:3, Exhibit 1.

[63] See, Vandewater, deposition, 50:1-25, Exhibit 7; McCorry deposition, 38:3-15, Exhibit 4; Delamater deposition, 76:9-16, Exhibit 5.

[64] See, Vandewater deposition, 49:24-50:1, Exhibit 7.

[65] See, Yeganeh deposition, 33:11-15, Exhibit 8.

[66] See, Third Amended Complaint paragraph 30 and Applebee's Answer to paragraph 30 found in paragraph 22.

22

servers and bartenders.  Further, as set forth below, Applebee's prescribes uniform standards which each of its employees must follow.

### 1.  Applebee's "Core Manual" and "Day Cards".

Relevant portions of the Applebee's CORE Manual, which as referenced earlier is available in every state, are attached to these Suggestions.  Reviewing the table of contents for the bartenders and servers demonstrate that each of the opt in plaintiffs had a specific list of duties to perform and a prescribed manner in which to perform them.  In addition, several of the duties performed clearly fall within general preparation and maintenance work.   For examples, bartenders have duties which include cleaning the blender, cleaning the ice bin, cleaning the beadboards, and cleaning brass and chrome.[67]  Servers have standards which let them know how to roll silverware, clean coffee machines, and clean tile floors in the bar, bathroom, and foyer.[68]

The day cards that govern the conduct of all opt in plaintiffs at all locations also demonstrate that the opt ins perform the same duties.  For example, the day cards for bartenders spells out all the activities that are required of bartenders including cleaning bar equipment, cleaning bar top, cleaning peanut rail, and cleaning out the ice bin.[69]  Similarly, the day cards that dictate that servers' daily behavior includes cleaning tiffany lights, wiping windowsills, vacuuming, roll up rugs and rolling silverware.[70]   The day cards are so specific in the duties that apply to all opt ins that one requires the following: "After you present the check, take five steps

---

[67] The Assocate CORE Manual table of contents for the bartender position is attached hereto as Exhibit 6 and incorporated herein by reference.

[68] The Associate CORE Manual table of contents for the server position is attached hereto as Exhibit 6 and incorporated herein by reference.

[69] A copy of the day cards for bartenders are attached hereto as Exhibit 21 and incorporated herein by reference.

[70] A copy of the day cards for servers are attached hereto as Exhibit 20 and incorporated herein by reference.

23

away from the table and take a look back to see if the Guest has placed money or credit card on the table – you can expedite the payment process for the guest."[71]  The duties for all servers and bartenders of Applebee's are set forth in detail in its training material and corporate manuals. These duties are performed by the opt in plaintiffs.  The list of duties for a server in Missouri is the same list as a server in Michigan and is the same list as a server in Virginia.  The same duties are required of any server or bartender of Applebee's no matter the location.[72]

Applebee's asserts that the plaintiffs spend varied times conducting the duties and some opt in plaintiffs report doing a duty that others do not report conducting.  Does Applebee's seriously contend that because one server may spend 10 minutes washing dishes where another may spend 20 minutes washing dishes during their shifts that they are so different that they cannot collectively join in to complain about Applebee's failure to properly compensate them for their time spent in general preparation and maintenance work?  No matter if the server spent 10 minutes or 20 minutes, they both were doing dishes, they were both servers at Applebee's, and they were both improperly compensated for their time.  Even if the opt ins "did not perform exactly the same duties…[that] does not undermine the conclusion that the putative class is similarly situated."  *Falcon v. Starbuck's Corp.*, 580 F.Supp.2d 528, 540.

As noted in *Frank v. Gold'N Plump Poultry, Inc.*,

"[i]f one zooms in close enough on anything, differences will abound; even for a single employee doing a single job, the amount of time that she spends [working off the clock] donning and doffing on Monday will differ, at least minutely, from the amount of time that she spends donning and doffing on Tuesday.  **But plaintiffs' claims need to be considered at a "higher level of abstraction**."

---

[71] See, Id. at AP001639.

[72] See, Vandewater deposition, 26:17-22, Exhibit 7.

2007 U.S.Dist. LEXIS 71179 at *2-3 (emphasis added).  If Applebee's argument that since the

opt ins did not spend the same amount of time in the same tasks and, therefore, they are not

similarly situated were correct there would never be a FLSA collective action.  Courts have

recognized the fallacy of this argument and routinely discounted it. *See*, *Pendlebury*, 518

F.Supp.2d at 1362,

> ("In sum, every class under § 216 (b) will have differences; however, class members need
> only be similar, not identical.  If Defendant's contentions that the class must be similar in
> almost all respects was to prevail, the intent behind class certification under §216(b)
> would be frustrated and the statute's class provisions would be effectively
> emasculated.").

Applebee's also argues that the Court should simply ignore plaintiffs' experts and follow

its expert who surprisingly concluded that the thirty employees (the majority of which where not

opt in plaintiffs) he watched on video tape (for the period of one week's time, after the filing of

this lawsuit) spent only 18% of their shifts on general preparation and maintenance work.[73]  For

the purposes of this motion, defendant's expert's study merely reinforces denial of

decertification.  The employees monitored performed the same duties.[74]  They clearly were

subject to similar factual and employment settings, and even under Applebee's retained expert's

flawed analysis, some of the subjects he viewed spent more than twenty percent of their shifts

performing general preparation and/or maintenance work.  See, Suggestions in Support of

Defendant's Motion to Decertify, p. 16.

---

[73] Plaintiff's questionnaire produced actual results from actual class members looking back at their shifts during the
relevant time period.  Applebee's hired an expert witness to attack the validity of the questionnaire, and  Plaintiff's
submit that Applebee's expert's results have serious validity problems including that he is conducting a "study"
where he does not even know how many opt in plaintiffs were included.  Perhaps the $600,000 he charged
Applebee's for his "study" has some effect on the outcome, but the validity, or lack thereof, of  the purported results
do not merit further discussion in this motion. See, Crandall deposition, 102:15-17, Exhibit 12.

[74] See, Crandall deposition, 74:24-75:3, Exhibit 12.

## 2.    Applebee's Uses its Servers and Bartenders Interchangeably.

Another factor showing that the bartenders and servers who are employed by Applebee's are similarly situated is the manner in which Applebee's uses them interchangeably at different locations.  Applebee's servers and bartenders routinely and easily transfer from one Applebee's location to another.[75]  Frequently, tipped employees from existing stores are used in new restaurants to temporarily cover new restaurant opening volume.[76]  These existing tipped employees are not re-trained in order to step into their role at the new restaurant.[77]  Those employees are able to easily transfer to the new store because their duties are similar from store to store.[78]  Also, new restaurant employees are often trained in existing restaurants before starting in the new restaurant.[79]  Normally there is little or no training when a server or bartender transfers from one location to another and the transition is usually "seamless."[80]  When staffing new restaurants, Applebee's needs to staff less associates overall if it will employ transfers from existing stores because those transfers are "pre-trained" and know the Applebee's culture.[81]  Applebee's trains its associates in its new restaurants by bringing in and using existing associates from all over the country.[82]  Those trainers use the same training materials all across the

---

[75] See, McCorry deposition 130:7-18, Exhibit 4.

[76] See, Sackett deposition 63:1-25, Exhibit 3; Delamater deposition, 79:8-22, Exhibit 5.

[77] See, Delamater deposition, 80:7-23, Exhibit 5.

[78] Id.

[79] See, Sackett deposition 59:17-60:22, Exhibit 3; Delamater deposition, 75:15-76:8, Exhibit 5.

[80] See, Yeganeh deposition, 164:13-165:17, Exhibit 8.

[81] See, Sackett deposition 18:2-7, Exhibit 3.

[82] See, Vandewater deposition, 39:2-42:8, Exhibit 7; Delamater deposition, 16:3-21, Exhibit 5.

country.[83]  Several plaintiffs who worked at more than one Applebee's location have testified that their duties among the various locations were the same or substantially similar.[84]

### 3. The "Associate Handbook".

All opt in employees were subject to the policies and practices contained in the Applebee's Associate Handbook.[85]  The Associate Handbook tells hourly associates what Applebee's expects of them on a company wide basis.[86]  This handbook requires employees to engage in the same behavior.  For example, employees must wear solid black dress pants or shorts, red or black golf shirts with an Applebee's logo and a black belt.[87]

Applebee's also requires that all visible tattoos be covered during any shift at the restaurant and specifies that employees are allowed to wear one ring on each hand, one necklace and one matched pair of pierced earrings (that do not extend past one-half inch below the ear).[88]  Applebee's policy dictates shorts worn by employees should not be more than two inches above the knee and skirts need be no more than two inches above or below the knee. [89]  The handbook spells out the discipline policies that apply to all employees.[90]  In addition, all employees are

---

[83] See, Vandewater deposition 60:4-19, Exhibit 7.

[84] See, E.S. deposition, 86:1-90:8, 90:19-91:4, Exhibit 22; C.S. deposition, 22:3-7, 63:12-64:6, Exhibit 23; J.H. deposition, 53:15-22, Exhibit 24; J.S. deposition, 24:10-25:20, Exhibit 25; R.L. deposition, 25:17-23, 30:16-23, Exhibit 26.

[85] See, Weston deposition, 108:1-11, Exhibit 1; Vandewater deposition, 71:12-20, Exhibit 7.  A copy of the Applebee's Associate Handbook is attached hereto as Exhibit 19 and incorporated herein by reference.

[86] See, Id.

[87] See, Applebee's Associate Handbook, AP 000180, Exhibit 19.

[88] See, Id. at AP 000180-181, Exhibit 19.

[89] See, Id. at AP 000180, Exhibit 19.

[90] See, Id. at AP000188, Exhibit 19.

27

subject to the same job performance reviews and standards.  The standards set forth in the Applebee's Associate Handbook are put in place to maintain similarity.[91]  Employees are reviewed twice a year pursuant to Applebee's Performance Improvement Process.[92]  Finally, the Applebee's Associate Handbook tells employees if they wish to transfer "No guarantees, but we we'll do our best.  We have over 1,800 options."[93]

Applebee's clearly strives for similarity in its restaurants.  To now point to minor differences and claim that each restaurant is a "disparate employment" shows how desperate it is to avoid a full hearing on the merits of plaintiffs' collective claims.

### D.        Applebee's is Able to Defend this Case on a Collective Basis.

Applebee's argues vehemently that it has individualized defenses to every one of the 5,549 opt in plaintiffs and that without mini trials for every plaintiff it will not be able to have a meaningful defense.  Applebee's argument ignores the manner in which FLSA cases are tried.

### 1.        The Intent Underlying FLSA Collective Actions.

Defendant argues in its motion to decertify that there are individualized defenses to each and every one of the opt in plaintiff's claims so the Court should decertify the class.   If this argument were successful, there would never be any Section 216 collective actions since there will always be differences among class members.  Applebee's also argues that due to the large number of opt ins, the manageability of any trial would be impossible.  However, "any large class of employees working for a nationwide employer alleging FLSA overtime violations will encounter these difficulties, and there is no indication that Congress intended section 216 to only

---

[91] See, Vandewater deposition 103:1-3, Exhibit 7.

[92] See, Applebee's Associate Handbook, AP 000184, Exhibit 19.

[93] See, Id. at AP 000184, Exhibit 19.

allow small collection actions…to proceed." *Falcon*, 580 F.Supp.2d at 540, *citing Donohue v. Francis Services, Inc.,* 2004 U.S. Dist. LEXIS 11525 at * 1 (E.D. La., June 22, 2004) (refusing to decertify a collective action on allegations that the class was too large and noting that "[a]dopting defendants' reasoning would lead to the absurd result that employers could escape FLSA liability by making sure to underpay vast numbers (rather than smaller numbers) of their employees.").

FLSA cases are proved at trial with representative testimony.  Courts have allowed and even required the use of representative testimony in FLSA cases.  See, *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973); *Schultz v. Captial Intern. Sec., Inc.*, 466 F.3d 298, 310 (4th Cir. 2006); *Reich v. Gateway Press*, 13 F.3d 685, 701-02 (3rd Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); *Kautsch*, 2008 WL 294271 at *3..

For example, in the case of *Wilks v. Pep Boys,* 2006 U.S. Dist. LEXIS 69539 (M.D. Tenn. 2006) the court held as follows regarding the individualized defenses issue in collective actions under the FLSA:

> "After considering the defenses that will likely be appropriate in this case, the court finds that each of them could be raised in a collective forum, where the defendant will be free to present evidence of its lawful employment policies and practices, to cross-examine individual representative plaintiffs, and to call to the stand others with material testimony that the defendant's case."

See also, *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 484 (E.D.N.Y. 2001) ("[S]tanding alone, the prospect of individualized defenses should not defeat authorization of a collective action…"). The court in *Wilks* went on to state that allowing the plaintiffs to proceed collectively "is in line

29

with Congress's determination that defendants will not always have the opportunity to pursue individual defenses against FLSA plaintiffs but, instead, must collectively defend a suit that is pursued." *Wilks*, 2006 U.S. Dist. LEXIS 69539 at *8. In *Falcon v. Starbucks* the Court similarly found that "defendants will be allowed to raise all of its asserted defenses by examining representative plaintiffs and presenting its own evidence at trial." 580 F.Supp.2d at 540-41.

The most common way for a court or jury to come up with damages in FLSA action where the employer has failed to keep records of the hours worked is through the use of representative testimony. *Martin v. Selker Bros., Inc.*, 946 F.2d 1286, 1298 (3rd Cir. 1991). As with any representative testimony, the actual damages suffered by each class member will differ in nearly all cases using representative testimony. However, courts routinely fashion relief based on testimony of representative witnesses. See, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 683-84 (1946) (awarding damages to 200 employees based on testimony of seven); *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3rd Cir. 1994) ("courts commonly allow representative testimony to prove violations with respect to all employees."); *Martin*, 946 F.2d at 1298 (3rd Cir. 1991) ("It is not necessary for every single affected employee to testify in order to prove violations or to recoup back wages. The testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations.")

It is recognized that it is the responsibility of the employer to keep adequate records and their failure to do so cannot then be used against employees in a FLSA action. As the court in *McLaughlin v. Dialamerica Marketing, Inc.,* 716 F.Supp. 812, 823 (D.N.J. 1989), held in a case where the employer failed to maintain records on the numbers of hours worked by the plaintiffs, "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend of his acts" due the plaintiffs

30

inability to prove damages with precision. To address this situation (the one before this very Court) the trial court is vested with a "great deal of discretion in determining the most accurate amount to be awarded." *Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 828 (11th Cir. 1998). Where the employer's records do not assist in establishing the hours worked by the employees, "…the district court must look to the litigants for assistance." *Id.*

That is what happened here. Applebee's admits it did not keep track of the hours worked by the plaintiffs in general preparation and maintenance work. In an effort to assist the court and jury in computing the appropriate damage award, the plaintiffs and their expert developed a questionnaire to try to reconstruct this compensable time. Applebee's simply throws stones at the questionnaire and purposely uses outlier response in an attempt to distort the results. This is truly a bold move for Applebee's. Rather than keeping track of these hours or changing their behavior as they promised the DOL, they did nothing and then criticize the plaintiffs' method of trying to do their job. Indeed, Applebee's own expert stated that "the gold standard" in verifying data is to have records available and that Applebee's did not provide him with any time records to show what duties people were doing and for how long.[94]

Once again, this defense is often raised by defendants as a basis for decertification and routinely denied. As stated by the court in *Pendlebury*, "contradictions are matters of credibility for the factfinder, not individualized defenses." 518 F.Supp.2d at 1362. Issues of credibility do not weigh in favor of decertification. *Id.* In the present case, the parties have already agreed and disclosed trial witnesses. Applebee's will have a full and fair opportunity to cross examine any representative witnesses and call opposition witnesses to test their credibility.

---

[94] See, Crandall, deposition, 183:15-184:20, Exhibit 12.

Applebee's citation to *Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir. 1991) for the proposition that plaintiff's must prove their case by individualized proof is plainly incorrect. In *Murray*, the plaintiffs sought to use the burden shifting analysis under the *Anderson* case as it related to their damage calculation. The defendant argued that the district court erred when it shifted the burden to them when the district court rejected some of the plaintiffs' individual estimates of hours worked. The court held the following "we agree with Stuckey's that *Mount Clemens* requires the plaintiff in a falsified records case to present a prima facie case as to the unpaid overtime hours worked before the burden of proof shifts to the defendant." *Id.* at 621. Significantly, the present case is not a falsified records case. While Applebee's admits it did not keep any records of the time its employee's spent engaged in general preparation and maintenance work, there are no allegations of falsified records.

## 2. Applebee's Agreed to the Procedure for Representative Evidence.

Finally, Applebee's must be reminded that the fairness and procedural considerations of the trial of this case have already been agreed to by all parties. On October 29, 2008, the plaintiffs and Applebee's agreed that plaintiffs would be allowed to call up to fifty opt in plaintiff witnesses in this case and Applebee's would be allowed to call up to sixty witnesses. All parties agreed to this and agreed to waive their right to appeal on the number of witnesses each party would be allowed to call at trial.[95] Therefore, Applebee's cannot now be heard to request the ability or need to call all 5,549 plaintiffs or argue that the trial of this case would be unmanageable. The trial of this case will certainly be manageable since the parties have already agreed on the number of witnesses to be called.

---

[95] See, Minute Sheet attached hereto as Exhibit 27.

### E.    Fairness and Procedural Considerations Point to Denial of Decertification.

When examining the third prong of a motion to decertify it is important to consider that the FLSA is a remedial statute and "it should be given a broad reading, in favor of coverage." *Kelley v. Alamo*, 964 F.2d 747, 749-750 (8th Cir. 1992); see also, *Reich v. Cicle C. Investments Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) and *Prickett v. DeKalb County*, 349 F.3d 1294, 1296 (11th Cir. 2003) ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction."). In addition, the Supreme Court has recognized that Congress intended to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman*, 493 U.S. at 170.

The consequence of decertification would be that over 5,500 employees would lose their ability to pursue their claims. Plaintiffs are comprised of thousands of employees who without question have been paid significantly less than minimum wage for the hours they worked. To assume that these plaintiffs would pursue these claims individually would be to ignore the practical considerations and costs associated with litigation. When the likelihood of individuals pursuing their claims individually is small, courts often find that fairness and procedural considerations weigh in favor of allowing the collective action to move forward. See, *Bradford v. Bed, Bath & Beyond*, 184 F.Supp.2d 1342, 1351 (N.D. Ga. 2002) and *Pendelbury*, 518 F.Supp.2d at 1363. See also, *Falcon*, 580 F.Supp.2d at 541 (finding, "[A]lthough the remedial nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively, it does at least suggest that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification.").

Applebee's next makes a due process argument by asserting it would not be fair to defend these claims collectively. However, Applebee's due process rights must be weighed against the

33

due process rights of the plaintiffs whose claims would never see the inside of a court room if Applebee's Motion to Decertify were granted. *See*, *Wilks*, 2006 U.S. Dist. LEXIS 69539 at *8. Courts that have engaged in that balancing test have routinely found in favor of the plaintiffs. See, *Id.* and *Falcon*, 580 F.Supp.2d at 541.

Applebee's argues that this Court should follow the same procedures followed in the case of *Johnson v. Big Lots Stores, Inc.* 561 F.Supp.2d 567 (E.D. La. 2008). Interestingly, Applebee's urges this Court to follow *Big Lots* and then argues for an outcome that was rejected by the court in *Big Lots*. In that case, the court reconsidered its denial of the defendant's motion for decertification at the trial of the case. *Id.* at 569. In this case, Applebee's argues that plaintiff's should not even be given the opportunity to present its case as the court permitted in *Big Lots*. In *Big Lots*, as argued by Applebee's, the court struggled in a bench trial with the factual differences presented by each side. Once again, there is no authority for the Court at this stage to make any findings of fact as the court did in the trial of the case in *Big Lots*.

In addition, as cited by Applebee's, the court in *Big Lots* found that "the collective action device did not allow defendant to cross examine each plaintiff, much less call each plaintiff's store manager as a witness." *Id.* at 586. In our case, Applebee's has already agreed that it does not need to cross examine each plaintiff, but agreed to plaintiff's calling fifty witness and it agreed to call sixty witnesses.[96] Accordingly, the procedural and proof problems presented in the trial of the *Big Lots* case are not similar to the factual and procedural setting in this case.

Finally, Applebee's again argues that the damages in this case must be calculated individually and not collectively. *See*, Applebee's SIS p. 26. Once again, Applebee's has already agreed on the manner in which the trial in this case will proceed and agreed to waive its

---

[96] See, Order filed October 29, 2008, Exhibit 27.

34

right to appeal on that issue. Further, as set forth more completely above and as this Court found in *Kautsch*, "once an employee proves violations of the FLSA by just and reasonable inference, the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to dispute the reasonableness of the inference to be drawn from the employee's evidence." *Kautsch*, 2008 WL 294271 at * 8. "[I]f the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate…." *Id.* at *4, *citing, Dove v. Coupe*, 759 F.2d 167, 174 (D.C. Cir. 1985).

In the present case, Applebee's did not keep records on the amount of time its employees spent engaged in general preparation and maintenance work and has no idea how much time its bartenders and servers spend on tipped or non tip producing activity.[97] As such, it cannot now be heard to complain that plaintiffs are not able to state their damages by exactness. *Id.* To allow this argument would encourage employers such as Applebee's to fail to keep records on issues impacting the FLSA and stick their heads in the sand just as Applebee's has done here.

III.    **Conclusion**

Applebee's makes the same arguments made by all defendants in a motion to decertify - namely that the opt in employees are employed in "widely disparate factual and employment settings." Applebee's argues that the opt ins are employed at different locations with different managers. This is true, but Applebee's ignores that they are all subject to the same employment standards, job descriptions, and duties. According to its Form 10-K Applebee's tells its shareholders that all of its restaurants are operated in accordance with standards and specifications on a system-wide basis.[98] All restaurants must follow Applebee's prescribed

---

[97] See, Vadewater deposition, 108:20-109:3, Exhibit 7.

[98] See 2006 Applebee's 10-K, pg. 4-5 of 57, attached hereto as Exhibit 11.

35

CORE manual, Day Cards, and Associate Handbook. Most significantly, Applebee's has classified all of the opt in plaintiffs as similar by taking a tip credit against their compensation and all opt ins are subject to Applebee's self stated policy that its tipped employee's are not to engage in non tip producing duties in excess of 20% of their shift, which as set forth above Applebee's clearly is not enforcing. In short, Applebee's cannot have it both ways. It cannot be "uniform" and "system-wide" when it suits its purpose and individual and "disparate" when that suits it purpose.

To grant Applebee's Motion to Decertify would leave most, if not all, of the over 5,500 opt in plaintiffs without a practical remedy. The Court should deny Applebee's Motion to Decertify and allow the opt in plaintiffs to proceed collectively.

Respectfully submitted,


/s/ Timothy Van Ronzelen
Matthew A. Clement  #43833
Timothy W. VanRonzelen    #44382
Kari A. Schulte          #57739
Cook, Vetter, Doerhoff & Landwehr, P.C.
231 Madison
Jefferson City, Missouri 65101
Telephone: (573) 635-7977
Facsimile: (573) 635-7414
mclement@cvdl.net
tvanronzelen@cvdl.net
kschulte@cvdl.net

                and

Charles A. Gentry             #46388
Jason H. Ludwig               #58945
Carson & Coil
515 East High Street
P. O. Box 28
Jefferson City, Missouri 65102
Telephone: (573) 636-2177
Facsimile: (573) 636-7119
Chip.g@carsoncoil.com
Jason.l@carsoncoil.com

**ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE


I hereby certify that on the 17th day of February, 2009, I have caused a true copy of the above document to be filed electronically with the Clerk of the Court using the CM/ECF system which sent notification of such file to Daniel B. Boatright and S. Jane Bruer of Spencer, Fane, Britt & Browne, LLP, 100 Walnut, Suite 1400, Kansas City, Missouri 64106, attorneys for defendant.


                /s/ Matthew A. Clement_____