# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

GERALD A. FAST, on behalf of himself    )
and as class representative for    )
all others similarly situated,    )
    )
        Plaintiff,    )
    )    **CASE NO. 06-4146-CV-C-NKL**
        v.    )
    )
APPLEBEE'S INTERNATIONAL, INC    )
d/b/a APPLEBEE'S NEIGHBORHOOD    )
GRILL & BAR    )
    )
        Defendant.    )

## PLAINTIFFS' SUPPLEMENTAL BRIEF
## ON PENDING MOTIONS (DOCS. 176 AND 178)

Come Now, Plaintiffs, by and through counsel, and address the questions raised during oral arguments in this case on April 14, 2009, as follows:

### I. Introduction

This Court heard oral argument on April 14, 2009, related to the plaintiffs' pending Motion for Partial Summary Judgment and defendant's pending Motion to Decertify the Class. During the oral argument, the Court asked for additional authority regarding certain matters and also asked certain questions of the parties. This document is meant to answer the Court's questions of the plaintiffs as counsel understood them.

At the outset, plaintiffs feel compelled to respond to Applebee's mischaracterization and continued attacks on the law and facts of this case. This is a case about when Applebee's could properly take a tip credit against the opt in plaintiffs' right to earn minimum wage. The Department of Labor defines a tip as follows: "a tip is sum presented by a customer as a gift or

1

Case 2:06-cv-04146-NKL   Document 236   Filed 04/27/09   Page 1 of 12

gratuity in recognition of some service performed for him." See, 29 C.F.R. § 531.52. Employers like Applebee's who take advantage of the tip credit can only have their tipped employees perform a limited amount of their shift performing duties which are not "performed for a [guest]." In this case, plaintiffs have uniformly alleged that they are required to spend too much time performing duties that are not services for a guest, but are actually general services performed for Applebee's.

It is important to note that this Court did not make some novel or "out of the blue" finding when it denied Applebee's Motion for Summary Judgment and said that tipped employees could not spend more than 20% of their shift performing non-tipped duties. Quite to the contrary, Applebee's knew this was the law and told the DOL repeatedly that it knew the 20% limit and followed it.[1] It never once claimed confusion, ignorance, or even disagreement with this law and its own policy until it was questioned about its assertion of the "good faith defense" which is the subject of plaintiffs' Motion for Partial Summary Judgment.

## II. Questions/Issues

1. <u>What general authority exists that further explains the Fair Labor Standards Act and the manner in which such cases are collectively tried?</u>

The Court requested the parties to disclose any general authorities or treatises that may be helpful regarding the FLSA. The plaintiffs have reviewed <u>The Fair Labor Standards Act</u> by Ellen C. Kearns. In addition, plaintiffs have found documents related to the 2006 National Employee Rights Institute and Chicago-Kent College of Law Employee Rights and Employment Law Policy Journal helpful in addressing the FLSA issues in this case. The written material

---

[1] See, letter from Applebee's to DOL dated, August 4, 2005 (it is Applebee's policy that "these duties should not exceed 20% of the shift…"); attached hereto as Exhibit 1; September 15, 2005, letter from Applebee's to the DOL (stating that it is Applebee's policy that "these duties should not exceed 20% of the shift…" and then repeating that it is Applebee's policy "that non-tipped duties should not exceed 20% of the shift…") attached hereto as Exhibit 2.

2

from this symposium can be found at *10 Empl. Rts. & Employ. Pol'y J. 427, et seq.* under the title "Symposium: Class and Collective Actions in Employment Law."

      2.      <u>What is the citation to other large FLSA cases?</u>

Employees have relied on the FLSA for protection against employer abuses in both small and large FLSA cases. The Court asked the plaintiffs to cite any cases they knew of which were similar in size to the current case. The following are examples of FLSA cases litigated by large groups of employees:

- *Barton, et. al. v. Albertson's Inc.* involved around 150,000 employees who were employed at Albertson's locations in 20 different states seeking compensation for unpaid overtime. The case settled prior to trial.[2]

- Thousands of nurses, LPNs and nursing assistants employed by SunRise Healthcare Corp., which has 392 care facilities in 29 states, filed a collective FLSA action.[3]

- In the case of *Janice v. Longs Drug Stores*, No. 99-CV-1100 (N.D. Cal. March 29, 2002), there was a reported $5 million settlement where workers at 370 stores in several different states filed suit seeking protection by the FLSA.[4]

- In *Yates v. Wal-Mart Stores, Inc.*, 58 F.Supp. 2d 1217 (D. Colo. 1999), 69,000 workers sought unpaid overtime by collectively joining in a FLSA lawsuit. That matter was settled.[5]

- *Meyers v. Prudential Securities*, No. 8:96 cv02549 (M.D. Fla.) involved over 5,200 employees nationwide seeking unpaid overtime. That matter was settled as well.[6]

---

[2] *Barton, et. al. v. Albertson's Inc.* No. 97-00159 (D.Idaho 1997); *Albertson's Settles Suits*, 1999 WL 9849021, The Journal Record, Dec. 2, 1999; *Opt-In Class Actions: Collective Litigation Under the FLSA, ADEA and EPA*, Mark S. Dichter, 2003, p 33, www.morganlewis.com/pubs/AA91317F-286E-4E76-9A19361549930591_publication.pdf.

[3] *Suit Alleges Wage, Hour Violations at SunRise Healthcare Corp. Facilities*, Daily Lab. Rep. (BNA) No. 103, at A-9 (May 28, 1999); *Trends in Workplace Litigation: The Rising Popularity of FLSA Class Actions,* Samuel D. Walker and Jennifer E. Chung, 1999, American Bar Association, www.bna.com/bnabooks/ababna/annual29.pdf.

[4] *Employees of Longs Drug Stores Allege Overtime Violations in Class-Action Suit,* Daily Lab. Rep. (BNA) No. 49, at A-10 (March 15, 1999); *Trends in Workplace Litigation: The Rising Popularity of FLSA Class Actions,* Samuel D. Walker and Jennifer E. Chung, 1999, American Bar Association, www.bna.com/bnabooks/ababna/annual29.pdf; *Opt-In Class Actions: Collective Litigation Under the FLSA, ADEA and EPA*, Mark S. Dichter, 2003, p 33, www.morganlewis.com/pubs/AA91317F-286E-4E76-9A19361549930591_publication.pdf.

[5] *Opt-In Class Actions: Collective Litigation Under the FLSA, ADEA and EPA*, Mark S. Dichter, 2003, p 33, www.morganlewis.com/pubs/AA91317F-286E-4E76-9A19361549930591_publication.pdf.

[6] *Opt-In Class Actions: Collective Litigation Under the FLSA, ADEA and EPA*, Mark S. Dichter, 2003, p 34, www.morganlewis.com/pubs/AA91317F-286E-4E76-9A19361549930591_publication.pdf.

- In *Harrison, et. al. v. Enterprise Rent-A-Car*, No. 98-CV-233 (M.D. Fla. (Tampa) July 1, 1998), notice of a FLSA collective action seeking proper pay for overtime was sent to 12,000 employees. That matter settled.[7]

- Shoney's Inc. was sued by 19,000-22,000 former and current managers and assistant manager's in a FLSA action; that matter was settled.[8]

- *Bell v. Farmers Insurance*, 115 Cal. App.4th 715 (Cal. App. 2004) was a case involving the California state version of the FLSA and included 2,500 employees. The case resulted in damages of about $110 million.

3.    How does the Court balance the right of the plaintiffs to join their claims, which may have a low dollar value, with the defendant's desire to defend such claims individually?

The Court asked the parties about the relative balancing of the plaintiffs' individual claims which are relatively small against the defendant's desire to defend those individual claims. Other courts have been faced with similar balancing issues and have found that the rights of the plaintiffs outweigh the rights of the defendant to challenge each individual claim. See, *Wilks v. Pep Boys*, 2006 U.S. Dist. LEXIS 69637 (M.D. Tenn., September 26, 2006) ("Although the defendant contends that decertification is necessary to protect its due process rights…these rights must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court.)" *citing Glass v. IDS Fin. Sers. Inc.*, 778 F.Supp. 1029, 1081-82 (D. Minn. 1991) (finding that, although the defendant complained that collective treatment would infringe upon its due process rights, such treatment was necessary in order to protect the rights of the plaintiffs, who were "less able to

---

[7] *Opt-In Class Actions: Collective Litigation Under the FLSA, ADEA and EPA*, Mark S. Dichter, 2003, p 32, www.morganlewis.com/pubs/AA91317F-286E-4E76-9A19361549930591_publication.pdf; *Trends in Workplace Litigation: The Rising Popularity of FLSA Class Actions,* Samuel D. Walker and Jennifer E. Chung, 1999, American Bar Association, www.bna.com/bnabooks/ababna/annual29.pdf.

[8] *Shoney's To Pay Employees $18 Million To Settle Alleged Violations of Wage Laws*, Daily Lab. Rep. (BNA) No. 59, at A-6 (March 29, 1999); *Trends in Workplace Litigation: The Rising Popularity of FLSA Class Actions,* Samuel D. Walker and Jennifer E. Chung, 1999, American Bar Association, www.bna.com/bnabooks/ababna/annual29.pdf.

4

bear the cost of separate trials because they ha[d] fewer resources than [the defendant].)"  See also, *Falcon v. Starbucks Corp.*, 2008 U.S. Dist. LEXIS 3024 (S.D. Tex., January 15, 2008) (finding that the purposes of the FLSA dictate that "a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification.")

The Court also expressed a question related to how to deal with a situation where the opt in plaintiffs may have spent different amounts of time performing the activities at issue.  Again, as set forth above, the Court must strike a balance between certainty for each individual and protecting the rights of plaintiffs with small damages claims to join together.  This situation is similar to a class action under Rule 23 where individuals may receive more or less in damages than if their claims were pursued individually.  As other courts have stated, this notion that plaintiffs may receive more or less "if they were to pursue their own claims is implicit in the very idea of a class action."  *Egge v. Healthspan Services Co.,* 208 F.R.D. 265, 272 (D. Minn. 2002)(quoting *Marcarz v. Transworld Systems, Inc.*, 193 F.R.D. 46, 55 (D. Conn. 2000).  The questionnaire that defendants attack so vigorously is merely one tool to help the jury and the Court develop a way to award class wide damages.  Admittedly, any class wide award rendered in this case will create a situation where some receive less than they may be entitled and others may receive slightly more.  An average type award is simply a reality of the situation that is contemplated by cases such as this, but it should not prevent certification of these types of cases.

The effect of granting decertification in this case presents the same issues addressed by the courts above.  Decertifying this case would mean that thousands of plaintiffs who have asserted claims in this case would have no effective remedy and their claims would never even be heard by a court or jury.  In addition, the balancing of the competing interests in this case should be weighed in favor denying Applebee's Motion since Applebee's has taken an all or

nothing position in regard to the relevant issues. In other words, Applebee's has argued that all of the work performed by the opt in plaintiffs is tip producing work. Presenting such an issue to individual finders of fact would clearly raise the very real possibility of different results.

The Eighth Circuit has addressed the question of how a district court should assess damages to a broad class of employees in a FLSA case and said the district court must "estimate and fashion a reasonable remedy that restores as fully as possible all of the employees covered by the FLSA who were improperly denied compensation." *Brock v. Tony & Susan Alamo*, 842 F.2d 1018, 1019 (8th Cir. 1988). Obviously, perfection is not required in the exercise of allocating damages in a FLSA class since by its very nature the employees will always be different. Rather, the district court is charged to fashion a reasonable remedy to restore as fully as possible the wages that should have been paid. See, *Id.* That can clearly be done with representative testimony. See, *Id.* at 1019-1020; and *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468,471 (11th Cir. 1982).

    4.   <u>What specific information shows the Court that the duties the opt in plaintiffs were and are performing is similar?</u>

It is important to note at the outset that the propriety of a FLSA collective action is appropriate in two separate instances. FLSA collective actions are appropriate when the plaintiffs can show **either** (1) that their employer engaged in a unified policy, plan, or scheme of FLSA violations **or** (2) if the plaintiffs can otherwise show that their positions are "similar, not identical, to the positions, held by other class members." *Kautsch v. Premier Communications*, 2008 WL 294271 (W.D. Mo. 2008).

All of the opt in plaintiffs were subject to Applebee's scheme of requiring its employees to engage in more than 20% of their shift performing non-tipped work while being paid at a rate below minimum wage. Applebee's scheme works in the following way; first, Applebee's

6

requires its tipped employees to follow specific job descriptions which include a substantial amount of general maintenance and preparatory work; second, when Applebee's was investigated by the DOL for requiring its tipped employees to spend more than 20% of their shift on non tip producing duties, Applebee's admitted that it knew of the 20% rule and informed the DOL that it followed this rule and that it is their policy to follow the rule; third, the undisputed evidence from Applebee's corporate representatives shows that Applebee's tells none of its managers or supervisors of the opt in plaintiffs of the 20% rule. So, in effect, tipped employees being paid less than minimum wage are required to engage in substantial general preparation and maintenance duties and Applebee's not only raises no objection to this work being done by opt in plaintiffs, but indeed requires this work to be done while at the same time saving valuable labor dollars.[9]

The citations to the record of the above scheme are explained in more detail in plaintiffs' Suggestions in Opposition to Applebee's Motion to Decertify. The above facts are truly not disputed since the evidence in the record supports each facet of the above factual statements. One could even say Applebee's has taken an even more stringent and contrary position now. Applebee's told the DOL that they followed the 20% rule and that non tip producing duties should be kept to less than 20% of an employee's shift. However, during oral argument Applebee's disavows the very policy that it assured the DOL it followed and now takes the position that all work done by plaintiffs during their shift is tip producing work. Applebee's counsel confirmed during oral argument that a server cleaning the restroom would be tip producing work since it would "enhance the guest's experience." Accordingly, since all of the plaintiffs were subject to this policy (or lack of a policy) the requirement for a FLSA collective

---

[9] Specific references to the job descriptions and corporate representative testimony are cited in Plaintiffs' Suggestions in Opposition to Applebee's Motion to Decertify.

Case 2:06-cv-04146-NKL   Document 236   Filed 04/27/09   Page 7 of 12

action is met.

The evidence related to decertification must be viewed in the light of what this case is really about. Plaintiffs essentially allege that Applebee's requires its servers and bartenders to perform too much general preparation or maintenance work rather than "tipped duties" for their pay rate to be lessened by use of the tip credit. According to 29 C.F.R. § 531.52, a "tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed <u>for him</u>." (emphasis added). It is significant that the Department of Labor has defined tip in this manner. This shows "tipped duties" must be duties performed directly for the guest, as opposed to the general preparation and maintenance type duties that Applebee's alleges are all tipped because they indirectly "enhance the guest experience." Thus, the overriding policy or practice is not that Applebee's requires all tipped employees to do exactly the same general preparation and maintenance work. Rather, it is that Applebee's has created a system whereby their servers and bartenders are spending too much time in things other than "service[s] performed for [guests]" as 29 C.F.R. § 531.52 defines a tip.

Apart from the corporate policies mentioned, there is other evidence showing similarity, which generally falls into three categories. First, plaintiff's Suggestions in Opposition to Decertification footnote eighty-four refers to specific deposition testimony of opt in plaintiffs who worked at multiple Applebee's locations and performed essentially the same duties at each location. The fact that opt in plaintiffs seamlessly interchangeable among Applebee's restaurants shows that the jobs performed by the plaintiffs are substantially similar.

Second, Applebee's attached various exhibits to their Suggestions in Support of their Motion to Decertify including deposition testimony of opt in plaintiffs. Several of those depositions contain exhibits whereby the opt ins would break down the work they performed

8

before the restaurant opened, after it was opened, and then after it was closed. A cursory look at these charts shows that regardless of location, the duties being performed are remarkably similar. Plaintiffs would respectfully suggest examining the following exhibits by way of example: Exhibit J, LaBean Exhibit 1; Exhibit L, Lewis Exhibit 2; Exhibit N, Poff Exhibit A.

Finally, Plaintiffs also attach additional deposition testimony and exhibits from other servers and bartenders which demonstrate that regardless of location or shift the duties being performed by the opt in plaintiffs are similar. Examples from servers from Michigan, New Mexico, and Texas demonstrate specifically that the general preparation and maintenance duties performed by the opt in plaintiffs are very similar.[10] These servers all performed what is known as the 10 point station check, rolled silverware, and "side work."[11] All also report doing various cleaning tasks which are described by different names, but include wiping tables, cleaning blinds, setting up chairs, "daily cleaning," and "weekly cleaning."[12] These duties also usually took the form of preparing sani buckets (sanitation buckets), doing dishes and hauling trash.[13] These employees spent 43%, 63%, 59%, 58%, and 53%, respectfully of their shift on general preparation and maintenance duties.

When it comes to bartenders the same pattern is seen. Three bartenders from Tennessee, New Mexico, and Texas present the same set of circumstances.[14] All of these bartenders stocked items, performed cleaning tasks, washed dishes, performed "prep work," and took care of the

---

[10] Attached hereto are the following: Exhibit 3 is deposition testimony and exhibits from Angela Herdegen a current server in Michigan. Exhibit 4 is deposition testimony and exhibits from the deposition of Casey Smith a server in Michigan. Exhibit 5 is deposition testimony and exhibits from Cassie Apodaca a former server and bartender from New Mexico. Exhibit 6 is deposition testimony and exhibits from Kimberly Burt a current server and bartender from Texas. Exhibit 7 is deposition testimony and exhibits from Katrina King a server from Texas. These exhibits are incorporated herein by reference.
[11] See, *Id.*
[12] See, *Id.*
[13] See, *Id.*
[14] Attached hereto and incorporated herein by reference as Exhibit 8 is deposition testimony and exhibits from Brooks Belhumer a former bartender from Tennessee.

Case 2:06-cv-04146-NKL   Document 236   Filed 04/27/09   Page 9 of 12

"carside to go" drive up customers.[15]  The percentage of time these bartenders spent performing non tipped functions were 68%, 50%, and 55%, respectively.

The similarity in the duties performed by the plaintiffs is not surprising considering all the plaintiffs are trained the same, employed under the same policies and procedures, and required to follow the Applebee's CORE manual.  While there is no doubt that plaintiffs spent somewhat differing times doing certain specific duties than others, these differences do not mean that a FLSA collective action should not be maintained.  See, *Frank v. Gold N' Plump Poultry, Inc.*, 2007 U.S. Dist. LEXIS 71179 (recognizing that "if one zooms in close enough on anything, differences will abound, even for a single employee doing a single job…")

    5.    <u>Manageability Concerns</u>.

The Court raised several issues that plaintiffs categorized as "manageability" concerns.  In other words, how does the Court manage a class of over 5,500 members?  As set forth above, a large FLSA class is not unusual.

Furthermore, Applebee's has taken and advocated the unreasonable position that since all employees spend a different percent of their time engaging in non-tip type producing work, a collective action could not even be maintained with the employees from the same store.  The Court attempted to explore possible compromises during oral argument regarding possible subclasses and this was quickly shot down by Applebee's since they claimed a collective action could not even be maintained on a single restaurant basis.

Plaintiffs believe that Applebee's scheme and the similarity of the plaintiffs would be best resolved in one trial using representative testimony.  However, in an effort to address some of the practical concerns plaintiffs believe this Court expressed, plaintiffs would respectfully suggest, if the Court is not inclined to maintain certification of nationwide class for trial purposes

---

[15] See, *Id.*

that the class could be broken down in at least two different ways that might address manageability concerns to the extent they exist.

One such approach would be to split the opt in plaintiffs into servers and bartenders. This would not reduce the number of plaintiffs, but could alleviate some of the issues raised in oral argument. In addition, Applebee's has restaurants that appear to be easily put in certain regions. This is represented in Exhibit 9 attached hereto and incorporated herein by reference. For example, there are a large number of locations in the central region of the United States. Plaintiffs could call representative plaintiffs from this area and this case could be tried using representative testimony. The other regions could thus also be tried on a similar basis. This would obviously result in several trials with fewer opt in plaintiffs in each trial.

The plaintiffs offer up these suggestions not by way of undercutting their belief that the current composition of the class is correct, but in an attempt to offer meaningful suggestions to address the concerns that plaintiffs understood the Court to express during oral argument. Should the Court decide that such subclasses are appropriate, plaintiffs would obviously need and request adequate time to arrange for the appropriate representative testimony and alternate damage calculations depending on what order is issued by this Court.

Respectfully submitted,

Matthew A. Clement  #43833
Timothy W. VanRonzelen    #44382
Kari A. Schulte        #57739
Cook, Vetter, Doerhoff & Landwehr, P.C.
231 Madison
Jefferson City, Missouri 65101
Telephone: (573) 635-7977
Facsimile: (573) 635-7414
mclement@cvdl.net

11

tvanronzelen@cvdl.net
kschulte@cvdl.net

and

/s/ Charles A. "Chip" Gentry
Charles A. Gentry        #46388
Jason H. Ludwig          #58945
Carson & Coil
515 East High Street
P. O. Box 28
Jefferson City, Missouri 65102
Telephone: (573) 636-2177
Facsimile: (573) 636-7119
Chip.g@carsoncoil.com
Jason.l@carsoncoil.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2009, I have caused a true copy of the above document to be filed electronically with the Clerk of the Court using the CM/ECF system which sent notification of such file to Daniel B. Boatright and S. Jane Bruer of Spencer, Fane, Britt & Browne, LLP, 100 Walnut, Suite 1400, Kansas City, Missouri 64106, attorneys for defendant.

/s/ Charles A. "Chip" Gentry _____

12